# IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF OKLAHOMA

CHAD WILLIAM REED,    )
           )
   Petitioner,    )
           )
v.           )   **Case No. 13-542-RAW-KEW**
           )
JASON BRYANT, Warden,   )
           )
   Respondent.   )

## OPINION AND ORDER

This matter is before the Court on Petitioner's petition for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254. Petitioner, a pro se inmate currently incarcerated at James Crabtree Correctional Center in Helena, Oklahoma, attacks his conviction in McCurtain County District Court Case No. CF-2006-581 for First Degree Murder. He sets forth the following grounds for relief:

1. The evidence was insufficient to prove the malice aforethought element of first degree murder.

2. The evidence was insufficient to support first degree murder, because the State failed to prove that Petitioner was not acting in self defense.

3. Irrelevant and inconsistent instructions, coupled with the prosecutor's misleading arguments, erroneously conveyed to the jury that Petitioner was not legally entitled to act in self defense, in violation of due process and the Equal Protection Clause.

4. Petitioner was denied his constitutional right to confront witness Wyva Clouse regarding her pending cases and any favorable treatment received by her in exchange for her testimony and witness Judy Rutherford regarding her prior arrest and any favorable treatment received by her in exchange for her testimony, in violation of the Sixth Amendment and Article 2 § 20 of the Oklahoma Constitution.

5.      The display of irrelevant and prejudicial photographs was reversible error and violated due process.

6.       The trial court erred in denying the motion for a new trial.

7.      The cumulative effect of all errors deprived Petitioner of a fair trial.

8.      Prosecutorial misconduct in violation of the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

9.      The State committed *Brady* violations in violation of due process.

10.     Ineffective assistance of trial counsel in violation of the Fifth and Sixth Amendments of the Constitution of the United States.

11.     Ineffective assistance of appellate counsel in violation of the Fifth and Sixth Amendments of the Constitution of the United States.

12.     Improper jury instructions denied Petitioner due process.

13.     Incomplete trial record denied Petitioner due process.

Respondent concedes that Petitioner has exhausted his state court remedies for the purpose of federal habeas corpus review. The following records have been submitted to the court for consideration in this matter:

A.      Petitioner's direct appeal brief.

B.      The State's brief in Petitioner's direct appeal.

C.      Summary Opinion affirming Petitioner's judgment and sentence. *Reed v. State*, No. F-2008-449 (Okla. Crim. App. Sept. 21, 2000).

D.      Petitioner's application for post-conviction relief.

E.      Motion to amend post-conviction application and supplement record.

F.      Order denying post-conviction relief.

G.  Order affirming denial of post-conviction relief. *Reed v. State*, No. PC-2013-698 (Okla. Crim. App. Oct. 17, 2013).

H.  State court record.

## Standard of Review

Under the Anti-Terrorism and Effective Death Penalty Act, federal habeas corpus relief is proper only when the state court adjudication of a claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

## Facts

Petitioner was convicted of the first degree murder of his 71-year-old grandmother Dorothy Hendrix. Ms. Hendrix had congestive heart failure and diabetes. Because walking left her "completely out of breath," she generally required the use of a walker or motorized wheelchair. (Tr. 142-44).

Petitioner and his girlfriend Patricia Hollingsworth lived in the victim's home with Hollingsworth's son, along with Ms. Hendrix's daughter Judy Rutherford. Ms. Hendrix disapproved of Petitioner and Hollingsworth sleeping together while unmarried, so the couple often spent the night at a motel. According to Hollingsworth, on the evening of November 21, 2006, Petitioner picked up Hollingsworth from work, and the two went to the Choctaw Casino and to the Travel Plaza. The couple then drove to the victim's home to pick

up some clothing to spend the night at a motel. (Tr. 254, 261, 278-80). They exited the vehicle, and although they intended to be in Ms. Hendrix's house for only a few minutes, Petitioner brought his semi-automatic handgun from the vehicle into the home. (Tr. 256-58).

When Petitioner and Hollingsworth entered the home, Ms. Hendrix was in the kitchen in her nightclothes, propping open the oven door to cool some Thanksgiving pies. (Tr. 258-59). Hollingsworth talked to Ms. Hendrix for a couple of minutes in the kitchen, then Ms. Hendrix made her way down the hall to her bedroom. (Tr. 280-81). Hollingsworth followed her down the hall, and Ms. Hendrix went into her room to go to bed. Petitioner already was in his room. (Tr. 260-61). Hollingsworth walked toward the kitchen from the back bedroom. (Tr. 265).

It had irritated Ms. Hendrix for a long time that Petitioner let Hollingsworth's dog get on the bed. (Tr. 282). Hollingsworth heard Ms. Hendrix yell from her room at Petitioner to get the dog off the bed. (Tr. 285). Petitioner went to the door of his grandmother's bedroom and argued about what difference did it make between Hollingsworth's dog or Ms. Hendrix's dogs being on a bed. (Tr. 263-65). When Petitioner said that, Hollingsworth heard Ms. Hendrix say, "I'll blow your fucking head off," then Hollingsworth immediately heard a gunshot. (Tr. 266-67).

Hollingsworth turned and saw Petitioner standing in the hall and looking into Ms. Hendrix's bedroom, holding the smoking gun down by his side. (Tr. 267-68). Petitioner said, "Call 911. I shot my grandma." (Tr. 268-69, 288). Petitioner joined Hollingsworth in the living room where she was calling 911. He just stood there, then put his gun on the arm of a recliner. (Tr. 269, 271). He did not show any emotion or appear to be in shock. (Tr.

287-89).

The couple waited outside, in front of the house. (Tr. 291). When officers arrived, Petitioner told them he had shot his grandmother. Sergeant Lorie Chipps secured the residence and checked on the victim, who was still alive. (Tr. 307-09, 315-16). Ms. Hendrix was lying in her bed, her right hand touching her head where she had a severe gunshot wound. Her eyes were open and she was looking around, but gurgling and unable to speak. (Tr. 316). When the paramedics arrived and moved Ms. Hendrix from the bed, police and medical personnel discovered a small handgun lying under her lower back. (Tr. 318-19, 351). She died in a Tyler, Texas, hospital the next morning. (Dkt. 12-9 at 50).

Sergeant Chipps gave Petitioner his *Miranda* warnings, after which Petitioner volunteered an account of what happened, because he said he had nothing to hide. He claimed he stopped at his grandmother's room to say he was leaving, and she angrily said, "[G]ood because I'm going to fucking shoot you." According to Petitioner, Ms. Hendrix leaned down from the bed to get her purse, from which she pulled out her gun wrapped in a white cloth, and attempted to shoot him. When the gun did not fire, she pulled the gun back, turned it, took off the safety, and then pointed it at him again. Petitioner claimed he had no choice but to shoot her in self-defense. (Tr. 323-24).

At the police station, Petitioner told OSBI Agent Cliff Fielding, contrary to what Hollingsworth observed, that Petitioner's gun already was in Ms. Hendrix's house. Petitioner stated he retrieved it from his bedroom drawer, so it would not be stolen while he was at a motel overnight. Petitioner said that Ms. Hendrix was in bed with a book when she angrily told him she wanted Hollingsworth's dog off the bed and that Petitioner needed to leave the

5

house or she would shoot him. Petitioner also told Fielding that Ms. Hendrix pulled her gun from her purse next to the bed and tried to shoot at him, but the gun did not go off. She then turned the gun, took off the safety, and pointed it at him again. Petitioner stated he pulled his gun from his pants and shot her once in the head. (Tr. 453-56, 460).

Two days prior to the shooting, Petitioner visited his friend Wyva Clouse. Petitioner told Ms. Clouse he was angry at Hendrix, because she had been taking the Social Security death benefit from Petitioner's father's death. (Tr. 457-58, 464). Petitioner angrily complained to Clouse about his grandmother and told Clouse more than once that he wanted to shoot his grandmother in the head. (Tr. 186-90).

## I. Sufficiency of the Evidence (Grounds 1 and 2)

Petitioner alleges the evidence was insufficient to prove he acted with the deliberate intent to kill, and the evidence was insufficient to show he did not act in self defense.

### A. Standard of Review

"Sufficiency of the evidence can be considered to be a mixed question of law and fact." *Case v. Mondagon*, 887 F. 2d 1388, 1392 (10th Cir. 1989), *cert. denied*, 494 U.S. 1035 (1990). In federal habeas review of a state court conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).

The Supreme Court repeatedly has emphasized the deference the reviewing court owes to the trier of fact and "the sharply limited nature of constitutional sufficiency review." *Wright v. West*, 505 U.S. 277, 296 (1992) (citing *Jackson*, 443 U.S. at 319). "[A] federal

habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume--even if it does not affirmatively appear in the record--that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Jackson*, 443 U.S. at 326. The court must "accept the jury's resolution of the evidence as long as it is within the bounds of reason." *Grubbs v. Hannigan*, 982 F.2d 1483, 1487 (10th Cir. 1993) (citing *United States v. Edmondson*, 962 F.2d 1535, 1548 (10th Cir. 1992)). "To be sufficient, the evidence supporting the conviction must be substantial; that is, it must do more than raise a mere suspicion of guilt." *Beachum v. Tansy*, 903 F.2d 1321, 1332 (10th Cir.), *cert. denied*, 498 U.S. 904 (1990) (citing *United States v. Troutman*, 814 F.2d 1428, 1455 (10th Cir. 1987)).

### B. Malice Aforethought

Petitioner alleges in Ground 1 that the evidence was insufficient to prove malice aforethought. To determine whether there was sufficient evidence presented at trial to sustain petitioner's conviction for murder in the first degree with malice aforethought, the court first must look to Oklahoma law for the elements required for the crime. *Jackson*, 443 U.S. at 324 n.16; *see also Torres v. Mullin*, 317 F.3d 1145, 1152 (10th Cir.), *cert. denied*, 540 U.S. 1035 (2003). The statute for murder with malice aforethought provides:

> A person commits murder in the first degree when that person unlawfully and with malice aforethought causes the death of another human being. Malice is that deliberate intention unlawfully to take away the life of a human being, which is manifested by external circumstances capable of proof.

Okla. Stat. tit. 21, § 701.7(A). Under Oklahoma law, "malice aforethought" means "a deliberate intent to kill." *Malone v. State*, 168 P.3d 185, 198 (Okla. Crim. App. 2007). Oklahoma law further provides the intent to kill may be formed the instant before the act is

carried out. *Black v. State*, 21 P.3d 1047, 1062 (Okla. Crim. App.), *cert. denied*, 534 U.S. 1004 (2001) (citing Okla. Stat. tit. 21, § 702).

On direct appeal the Oklahoma Court of Criminal Appeals denied relief on this claim: "[T]aking the evidence in the light most favorable to the State, any rational trier of fact could find beyond a reasonable doubt that Reed shot the victim intending to kill her." *Reed v. State*, No. F-2008-449, slip op. at 2 (Okla. Crim. App. Sept. 21, 2009) (Dkt. 11-3). The OCCA supplemented this holding with the following footnote:

> *Dodd v. State*, 100 P.3d 1017, 1041-42 (Okla. Crim. App. 2004). Malice means the deliberate intent to take a human life and may be formed in an instant. *Coddington v. State*, 142 P.3d 437, 455 (Okla. Crim. App. 2006); *Black v. State*, 21 P.3d 1047, 1062 (Okla. Crim. App. 2001); *Ullery v. State*, 988 P.2d 332, 347 (Okla. Crim. App. 1999). Malice may be proved by circumstantial evidence. *Coddington*, 142 P.3d at 455; *Black*, 21 P.3d at 1063-63. This Court accepts the finder of fact's reasonable inferences and credibility choices which support the verdict. *Coddington*, 142 P.3d at 455. Sufficient evidence showed Reed intended to kill Hendrix. Reed brought his loaded gun into the house. Hollingsworth testified that she heard Hendrix threaten Reed and immediately heard a gunshot. The shot was fired by Reed, who told her to call 911 because he'd shot Hendrix. Hollingsworth testified that Reed displayed no emotion, did not appear to her to be in shock, and did not go near Hendrix to check on her condition. Clouse testified Reed had recently said he wanted to shoot Hendrix in the head.

*Reed*, No. F-2008-449, slip op. at 2 n.1.

The OCCA's standard of "taking the evidence in the light most favorable to the State, any rational trier of fact could find beyond a reasonable doubt that [Petitioner] shot the victim intending to kill her" is the same standard as the federal standard for sufficiency of the evidence under *Jackson v. Virginia*. Therefore, this Court's inquiry is whether the OCCA's determination that the evidence was sufficient was reasonable under 28 U.S.C. § 2254(d).

Respondent alleges the OCCA's determination of this claim was supported by the

evidence presented at trial. Hollingsworth testified that when she and Petitioner arrived at Ms. Hendrix's house, he put his gun in his pants, although they were going in for only a few minutes. Petitioner's statement that the gun was already at Hendrix's house conflicted with Hollingsworth's testimony. (Tr. 256, 274). Ms. Hendrix and Petitioner had an ongoing dispute about Hollingworth's 120-pound bulldog being on the bed, and when Petitioner walked to Hendrix's bedroom door, he commented about Ms. Hendrix's small dogs being allowed on her bed. (Tr. 266, 286). Petitioner was unemotional when he told Hollingsworth to "[c]all 911, I shot my grandma." (Tr. 268, 295). He did not check on Hendrix's condition, render aid, or show any emotion. (Tr. 295-96).

Other evidence supporting the conviction was Ms. Hendrix's saying, "I'll blow your fucking head off," followed by an immediate gunshot, and Petitioner's standing at her bedroom door, looking in and holding his gun with smoke coming from it. (Tr. 266, 286). Ms. Hendrix's pistol was found on the bed, under the small of her back. (Tr. 319, 351). Petitioner told police that after Ms. Hendrix said she would shoot him, she reached down from the bed and retrieved her purse. She took out her gun, pulled the trigger to shoot Petitioner, turned the gun and released the safety, and aimed again at him. Petitioner told the police he was forced to shoot her in self-defense. (Tr. 323-24).

Furthermore, only two days before the shooting, Petitioner told Wyna Clouse he wanted to shoot Ms. Hendrix in the head. When Clouse responded with disbelief, Petitioner repeated the statement. (Tr. 189).

Petitioner alleges in his amended reply to Respondent's response (Dkt. 29) that because the OCCA held that the intent to kill may be formed in an instant before the act, the

jury should have only considered the evidence of what happened immediately prior to the shooting. He argues that this limitation would exclude Clouse's testimony about his statement two days before the shooting. Petitioner, however, has misread the OCCA's opinion which states that intent *may* be formed in an instant before the crime, not that it necessarily *is* formed immediately before the crime.

Petitioner also complains that Patricia Hollingsworth's was "coached" to testify that he took his pistol into the house upon his arrival. He claims that because Hollingsworth also testified that his taking the pistol into the house was not unusual, this evidence cannot establish premeditation. He further claims Hollingworth could not have seen what he was doing at his grandmother's bedroom door, because Hollingsworth had her back to him and had to turn around to see him.

Petitioner challenges Respondent's argument concerning his dispute with his grandmother over the dogs, and he asserts the incident did not show deliberate intent or malice aforethought. He further claims that if he had wanted to deliberately kill his grandmother, he could have shot her a second time when he saw she was still alive. He argues that if he had wanted his grandmother to die, he would not have told Hollingsworth to call 911, but would have prevented her from calling for help. He did not try to help his grandmother, because he has no medical training about how to treat a gunshot wound to the head, and he did not want to disturb the evidence. Further, his lack of emotion, which was caused by this traumatic incident, caused him to "shut down," and his demeanor should not have resulted in an unreasonable inference in violation of *Jackson v. Virginia*. Finally, Petitioner alleges Wyva Clouse's testimony about his statements two days before the

shooting was uncorroborated.

Based on this evidence, this Court finds that any rational trier of fact could have disbelieved Petitioner's statement that Ms. Hendrix was trying to shoot him, and found beyond a reasonable doubt that Petitioner shot Hendrix with malice aforethought immediately after she made her verbal threat. The Court further finds the OCCA's determination that Petitioner's conviction is supported by sufficient evidence is not contrary to, or an unreasonable application of, clearly established federal law, and the OCCA's decision is not based on an unreasonable determination of the facts. Ground 1 of the petition fails.

### C. Self-Defense

In Ground 2, Petitioner claims the evidence did not show he did not act in self-defense. In Oklahoma, self-defense is an affirmative defense which admits the elements of the charge, but offers a legal justification for the conduct. *McHam v. State*, 126 P.3d 662, 667 (Okla. Crim. App. 2005). The use of deadly force is justifiable only if the individual being threatened reasonably believed the use of deadly force was necessary to protect himself from imminent danger of death or great bodily harm. *Chapple v. State*, 866 P.2d 1213, 1215 (Okla. Crim. App. 1993). The mere belief that an individual is about to suffer death or great personal injury will not justify killing in self-defense, unless the belief is reasonable. *Bechtel v. State*, 840 P.2d 1, 6 (Okla. Crim. App. 1992). In assessing the reasonableness of such a belief, the jury should assume the viewpoint and circumstances of the defendant at the time of the killing. *Bechtel*, 840 P.2d at 11. The jury, however, also must take the defendant's viewpoint to be that of a reasonable person in similar circumstances and with the same perceptions. *Id.* Finally, the jury's self-defense determination is entitled to deference.

*Hancock*, 155 P.3d at 812 (citing *Hiler*, 796 P.2d at 349).

Petitioner argued on direct appeal that the State did not prove the shooting was not in self-defense, because the evidence showed that Ms. Hendrix's threatened Petitioner that she was going to "blow your fucking head off," and she pointed her pistol at him. Petitioner points to his statement to police that she pointed the gun, pulled it back to release the safety, and pointed it again, forcing him to shoot her in self-defense. (Tr. 323-34). He claims in his amended reply to Respondent's response that the fact that the pistol's safety was in the "off" position supported his version of the incident.

According to Hollingsworth, however, Petitioner's gunshot came immediately after Hendrix's verbal threat. When the police discovered Hendrix, she was lying flat on her back with the handgun completely under her body, under the small of her back. (Tr. 339). This evidence supports a finding the Petitioner shot immediately, and it conflicts with Petitioner's statement that Hendrix retrieved her purse, took out her gun, aimed, tried to shoot, released the safety, and raised her pistol to aim again.

The OCCA denied relief on this claim as follows: "[T]aking the evidence in the light most favorable to the State, any rational trier of fact could find beyond a reasonable doubt that Reed did not shoot Hendrix in self-defense." *Reed*, No. F-2008-449, slip op. at 2. The OCCA provided legal authority and rationale in a footnote:

> *Dodd*, 100 P.3d at 1042. A person acts in self-defense when he has a reasonable ground to believe deadly force is necessary to protect himself from imminent danger of death or great bodily harm. Okla. Stat. tit. 21, § 733. OUJI-CR (2d) 8-46; *McHam v. State*, 126 P.3d 662, 667 (Okla. Crim. App. 2005). The defendant's belief must be reasonable; fear or a defendant's good faith belief will not justify the taking of a life. *Hancock v. State*, 155 P.3d 796, 813 (Okla. Crim. App. 2007); *Camron v. State*, 829 P.2d 47, 51 (Okla. Crim. App. 1992). Once a defendant has raised self-defense, the State must prove

beyond a reasonable doubt that he was not acting in self-defense. *Hancock*, 155 P.3d at 813. Testimony suggested premeditation, and that Reed often argued with the victim. Hollingsworth testified that Reed's shot came immediately after Hendrix's threat. This is inconsistent with Reed's claim that Hendrix threatened him, pulled her gun, tried to shoot, took the safety off and aimed again before he shot her. Hendrix's gun was underneath her body, at the small of her back, and testimony indicated it was not moved during medical procedures. After shooting Hendrix, Reed neither expressed emotion nor checked on her welfare. While the evidence was conflicting, the jury could find beyond a reasonable doubt that Reed did not act in self-defense.

*Reed*, No. F-2008-449, slip op. at 2 n.2.

Respondent argues that although Hendrix's pistol was close to her, the evidence supports the finding that she was attempting to defend herself against Petitioner's aggression, rather than the reverse. Other than Hendrix's threatening words, there was no evidence apart from Petitioner's self-serving statement to police that she took any action. Furthermore, the gun was under her body, indicating she had no chance to defend herself.

In *Maes v. Thomas*, 46 F. 3d 979 (10th Cir. 1995), the petitioner argued the evidence was insufficient to support the conclusion that he did not act in self-defense. The Tenth Circuit rejected the claim, noting in part that "[t]he only evidence of self-defense came from the testimony of the petitioner" and that the petitioner "was the only witness to unequivocally place weapons in the hands" of his victims. *Id*. at 988. The evidence was that Petitioner fired his gun immediately after Ms. Hendrix made her verbal threat, undercutting Petitioner's version of Ms. Hendrix's actions.

Based on the above discussion, the Court finds the OCCA's decision on the issue of self-defense was neither contrary to, or an unreasonable application of, clearly established federal law, and the OCCA's decision was not based on an unreasonable determination of

the facts.  *See* 28 U.S.C. § 2254(d).  Petitioner is not entitled to habeas relief on this claim.

## II.  Jury Instructions (Ground 3)

Petitioner alleges, as on direct appeal, that the trial court erred in issuing the instructions on the law of self-defense.  He specifically claims that the jury instructions OUJI-CR(2d) 8-50 and 8-51, regarding aggressors, was improper, because there was no evidence he was the aggressor.  He also claims the prosecutor misstated the law, leading the jury to believe Petitioner was the aggressor.

Respondent alleges this claim is a matter of state law that does not raise an issue proper for federal habeas relief.  "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.  In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (citing 28 U.S.C. § 2241; *Rose v. Hodges*, 423 U.S. 19, 21 (1995) (per curium)).

> In a habeas corpus proceeding attacking a state court judgment based on an erroneous jury instruction, a petitioner has a great burden.  *Lujan v. Tansy*, 2 F. 3d 1031, 1035 (10th Cir. 1993), *cert. denied*, 510 U.S. 1120 (1994).  A state conviction may only be set aside in a habeas proceeding on the basis of erroneous jury instructions when the errors had the effect of rendering the trial so fundamentally unfair as to cause a denial of a fair trial.  *Shafer v. Stratton*, 906 F.2d 506, 508 (10th Cir. 1990), *cert. denied*, 498 U.S. 961 (1990).  "The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal."  *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977) (footnote omitted).  The question in this proceeding is not whether the instruction is "undesirable, erroneous, or even 'universally condemned,'" but whether the instruction so infected the trial that the resulting conviction violates due process.  *Id.* (quoting *Cupp v. Naughten*, 414 U.S. 141, 146 (1973)).

*Maes v. Thomas*, 46 F. 3d 979, 984 (10th Cir.), *cert. denied*, 514 U.S. 1115 (1995).

At trial, defense counsel objected to instructions OUJI-CR(2d) 8-50 and 8-51, and the trial court summarily overruled the objections. (Tr. 471-72). The challenged instructions were as follows:

> Self-defense is permitted a person solely because of necessity. Self-defense is not available to a person who was the aggressor, provoked another with the intent to cause the altercation or voluntarily entered into mutual combat, no matter how great the danger to personal security became during the altercation unless the right of self-defense is reestablished.

OUJI-CR 8-50 (Dkt. 11-9 at 7).

> A person who was the original aggressor, provoked another with intent to cause the altercation or voluntarily entered into mutual combat, may regain the right to self-defense if that person withdrew or attempted to withdraw from the altercation and communicated his desire to withdraw to the other participant in the altercation. If, thereafter, the other participant continued the altercation, the other participant became the aggressor and the person who was the original aggressor, provoked another with the intent to cause the altercation or voluntarily entered into mutual combat is entitled to the defense of self-defense.

OUJI-CR 8-51 (Dkt. 11-9 at 8).

Petitioner insists there was no dispute over who was the aggressor, and these two instructions should not have been given. The OCCA denied relief on this claim, which was Proposition III in the direct appeal, as follows:

> We find in Proposition III that the trial court did not abuse its discretion in giving the uniform jury instructions on self-defense; we further find that those instructions are not internally inconsistent. We also find in Proposition III that, as the instructions were accurate and the evidence conflicted as to who was the aggressor, the prosecutor did not misstate the law in argument.

*Reed*, No. F-2008-449, slip op. at 2-3 (footnotes omitted). The OCCA cited applicable state law in the accompanying footnotes:

> *Jones v. State*, 201 P.3d 869, 886 (Okla. Crim. App. 2009). Self-defense is not available to an aggressor. *Hancock*, 155 P.3d 796, 819. This includes a person who by provocative behavior initiates a confrontation without intending to kill the other person. *Allen v. State*, 871 P.2d 79, 93 (Okla. Crim. App. 1994). The jury heard conflicting evidence as to who was the aggressor. Where that issue is disputed, the jury should resolve the question after receiving the appropriate instructions. *Hancock*, 155 P.3d at 819; *Keith v. State*, 709 P.2d 1066, 1070.

*Reed*, No. F-2008-449, slip op. at 3 n.3.

> OUJI-CR (2d) 8-53 states that the use of words alone cannot make a person an aggressor, but that a person is an aggressor who "*by his wrongful acts* provokes, brings about or continues an altercation." This clearly tells jurors that an act, not words, are required.

*Reed*, No. F-2008-449, slip op. at 3 n.3 (emphasis in OCCA's Opinion).

Under Oklahoma law, when the trial court permitted the jury to consider Petitioner's self-defense theory, it was obligated to fully instruct on that defense, including the determination of whether Petitioner's use of deadly force was necessary. The Committee Comments to the Oklahoma Uniform Jury Instructions provide that the instructions for this situation require the inclusion of the instructions at issue:

> [Instructions 8-50 to 8-53] should be used only when a dispute exists as to whether the defendant or other participant in the altercation was at fault. When such a dispute exists, all four instructions should be given so the jury will be clearly informed as to the respective rights of the parties. Failure to give these four instructions would mean that the trial court had improperly assumed that the defendant was the aggressor.

Committee Comments, Instruction 8-53, OUJI-CR-53.

Here, there is no basis to suggest the disputed jury instructions denied Petitioner a fair trial and due process of law. Petitioner argued on direct appeal that the trial court should have tailored the instructions to the evidence, instead of using the uniform jury instructions.

The OCCA has held, however, that once a trial court has determined that a jury should receive instructions on a subject, the uniform jury instructions "shall be used unless the court determines that it does not accurately state the law." Okla. Stat. tit. 12, § 577.2. *See Hammon v. State*, 999 P.2d 1082, 1099 (Okla. Crim. App. 2000); *Palmer v. State*, 788 P.2d 404, 408 (Okla. Crim. App. 1994) (holding that trial court "correctly administered the uniform instruction rather that a paraphrase of the statute").

Petitioner insists his grandmother was the aggressor, because she verbally threatened him. The jury, however, was given an instruction that is not at issue here: "The use of words alone cannot make a person an aggressor." Instruction 8-53, OUJI-CR(2d) (Dkt. 11-9 at 9). Although Petitioner maintains his grandmother acted against him with her pistol, the State's evidence showed that Petitioner shot Ms. Hendrix immediately after her threatening words, making him the aggressor. The evidence that Petitioner was the aggressor supported and required the use of Instructions 8-50 and 8-51. The jury also was instructed that the State had the burden of proving beyond a reasonable doubt that Petitioner was not acting in self-defense, and that if the State failed to meet its burden, Petitioner must be found not guilty. Instruction OUJI-CR(2d) 8-49 (O.R. 271).

The State's case was that Petitioner shot Ms. Hendrix immediately after her threatening statement to him, and Petitioner's position was that Ms. Hendrix first tried to shoot him. The jury had the option of believing Petitioner's evidence; therefore, the trial issued self-defense instructions. Under Oklahoma law, the presence of the dispute over who was at fault required the jury to be given the instructions on aggressor law. The Court finds the instructions at issue were required, and Petitioner has not shown the instructions rendered

his trial so fundamentally unfair that he was denied a fair trial.

Petitioner also claims the prosecutor made an improper argument based on the disputed instructions.

> In a habeas corpus action, claims of prosecutorial misconduct are reviewed only for a violation of due process. *See Darden v. Wainwright*, 477 U.S. 168, 181 (1986). "[N]ot every trial error or infirmity which might call for application of supervisory powers correspondingly constitutes a failure to observe that fundamental fairness essential to the very concept of justice." *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974) (citations and quotations omitted). In order to be entitled to relief, [petitioner] must establish that the prosecutor's conduct or remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* at 643. This determination may be made only after considering all of the surrounding circumstances, including the strength of the State's case. *See Darden*, 477 U.S. at 181-82.

*Malicoat v. Mullin*, 426 F.3d 1241, 1255 (10th Cir. 2005), *cert. denied*, 547 U.S. 1181 (2006).

The record shows that during his closing, the prosecutor stepped sideways to illustrate how Petitioner could have stepped out of Ms. Hendrix's doorway to avoid any threat she posed to him while in bed with her pistol. Defense counsel objected, arguing the prosecutor's side-step was a statement to the jury that all Petitioner need to do was step out of the way. (Tr. 509). The trial court overruled the objection, and the prosecutor continued:

> I absolutely did a side step, ladies and gentlemen, because that deals with a necessity and that deals with a reasonableness and that deals the width of that doorway and that deals with [Petitioner] walking to her doorway when she is laying in the bed. Counsel read you that instruction, no duty to retreat. Who came to whom? She was laying in her bed; he came to her. In her house she was laying in her bed and he came to her. Think about the location of the gun. There's no question that there was a gun in that bed, but think about the location of that gun. Think about what [Petitioner] told Patricia Hollingsworth and what [Petitioner] told Lorie Chipps and what [Petitioner] told Cliff

18

Fielding. Does any part of that account for the gun being under the middle of her back. That makes no sense at all. And I wish could give you the perfect explanation for why the gun is back there under the middle of her back but I tell you it's not consistent with her being an aggressor towards him. Had it been laying off to the side, had it been in the floor, had it been on the unfolded part of the bed, had it been anywhere else that might be consistent with that. But for that to be under the middle of her back that doesn't make a bit of sense at all and that's not consistent with her being aggressive towards him.

[Petitioner] was the aggressor . . . in this confrontation. He is the one who came to her. He lied to Cliff Fielding about the gun, about bringing it into the house. He brought that gun into his grandmother's house. He did exactly what he told Wyva Clouse he was going to do two days earlier. He shot his grandmother in her head and she died from that. The State has met the elements that it was required to meet, those elements that we welcome. And we have met the burden that we were required to meet and in doing that we have met the burden that he was not acting in self-defense. Self-defense was not available to him; he was the aggressor.

(Tr. 509-10).

As discussed by the State on direct appeal, the prosecutor argued what it meant to be an aggressor. He did not argue that Petitioner had a duty to retreat, but whether a reasonable person would have thought deadly force was necessary. The prosecutor also illustrated the possibility of escape under the circumstances was as simple as Petitioner stepping out of his grandmother's doorway. Because there was a conflict over who was the aggressor, there was no error in the prosecutor's argument which asked the jury to apply the instructions to the facts. *See Evans v. Jones*, No. CIV-10-139-RAW-KEW, slip op. at 16-17, 2013 WL 5366385 at *12 (E.D. Okla. Sept. 24, 2013) (unpublished) (holding that where there was a dispute about who was the original aggressor, there was no constitutional error in the prosecutor's closing argument about the instructions), *certificate of appealability denied*, No. 13-7065 (10th Cir May 1, 2014), *cert. denied*, 135 S.Ct. 479 (2014).

After careful review, the Court finds Petitioner's claim in Ground 3 of this petition is grounded in state law and is not proper for habeas corpus review. The Court further finds that Petitioner has not shown that his trial was rendered fundamentally unfair by the instructions or the prosecutor's statements. This ground for habeas relief is meritless.

### III.  Witness Impeachment (Ground 4)

Petitioner alleges he was deprived of his confrontation right, because the trial court excluded evidence of two witnesses' alleged bias. He complains he should have been allowed to question Wyva Clouse about her pending criminal cases and any favorable treatment she received in exchange for her testimony. In addition, he should have been allowed to question Judy Rutherford about her prior arrest and any favorable treatment she received in exchange for her testimony.

The OCCA denied relief, finding "the trial court did not abuse its discretion in finding that the prior arrest or pending cases of two witnesses were not relevant to bias." *Reed*, No. F-2008-449, slip op. at 3. In a footnote, the OCCA expanded on its holding:

> The extent of questioning is left to the discretion of the trial court. *Scott v. State*, 891 P.2d 1283, 1294 (Okla. Crim. App. 1995). The defendant may cross-examine witnesses on prior arrests and convictions which are relevant to the witness's bias, but this determination is initially also left to the trial court's discretion. *Livingston v. State*, 907 P.2d 1088, 1092-93; *Scott*, 891 P.2d at 1294; *Beck v. State*, 824 P.2d 385, 389 (Okla. Crim. App. 1991). The trial court must determine whether the evidence allegedly creating bias is relevant, whether it is otherwise admissible, and whether it should be excluded as too prejudicial even if admissible. *Livingston*, 907 P.2d at 1093. The record does not support Reed's claim that either Rutherford's arrest and deferred charge for bad checks, or Clouse's pending criminal cases in Texas, were relevant to show bias in this case.

*Reed*, No. F-2008-449, slip op. at 3 n.4.

"The Sixth Amendment right to confrontation includes the right to cross-examination." *Jones v. Gibson*, 206 F.3d 946, 956 (10th Cir. 2000) (citing *Davis v. Alaska*, 415 U.S. 308, 315 (1974)). "[T]he exposure of a witness' motivation in testifying is a proper and important function of the constitutionally-protected right of cross-examination." *Id*. (quoting *Davis*, 415 U.S. at 316-17). Cross-examination permits an accused the opportunity to test the believability of a witness as well as the truthfulness of that witness' testimony. *Id.* at 316. The Confrontation Clause, however, "guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985). "[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986).

A federal habeas court has no authority to review a state court's interpretation or application of its own state laws. *McGuire*, 502 U.S. at 67-68. Further, state evidentiary determinations ordinarily do not present federal constitutional issues. *See Crane v. Kentucky*, 476 U.S. 683, 689 (1986) (noting Court's "traditional reluctance to impose constitutional restraints on ordinary evidentiary rulings by state trial courts"). The Supreme Court, however, has provided for an exception under some circumstances, if a state court applies the State's evidentiary rules unfairly to prevent a defendant from presenting evidence critical to his defense. *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973). "[T]o determine whether a defendant was unconstitutionally denied his or her right to present relevant evidence, [the

Court] must balance the importance of the evidence to the defense against the interests the state has in excluding the evidence." *Richmond v. Embry*, 122 F.3d 866, 872 (10th Cir. 1997), *cert. denied*, 522 U.S. 1122 (1998).

> [T]o establish a violation of . . . a fair trial or due process, a defendant must show a denial of fundamental fairness. . . . It is the materiality of the excluded evidence to the presentation of the defense that determines whether a petitioner has been deprived of a fundamentally fair trial. Evidence is material if its suppression might have affected the trial's outcome. In other words, material evidence is that which is exculpatory--evidence that if admitted would create reasonable doubt that did not exist without the evidence.

*Id.*, 122 F.3d at 872 (citations and internal quotation marks omitted. *See also Romano v. Gibson*, 239 F.3d 1156, 1168 (10th Cir. 2001) ("[W]e need ask no more than whether the trial court's application of this state evidentiary rule excluded critical exculpatory evidence.").

### A. Wyva Clouse

Wyva Clouse testified that Ms. Hendrix babysat her as a child, and Clouse continued her friendship with Hendrix into adulthood. Clouse also was close to Petitioner, and Petitioner came to Clouse's house to visit on a daily basis. A couple of days before Petitioner shot Hendrix, he was at Clouse's house. Petitioner told Clouse he was angry at Hendrix because "he was having to find a place and he didn't have a place and a job and they were fussing at the home." Petitioner told Clouse that Hendrix did not want him, his dog, or his belongings in her house. He said "he wanted to shoot [Hendrix] in the head." Clouse told Petitioner he could not do that, and Petitioner repeated that he wanted to shoot her in the head over a check, and Hendrix had used him for a check his whole life. (Tr. 181-89).

When Clouse learned of Hendrix's death, she did not report the statements Petitioner

had made to her. Eight months after Hendrix's death, however, Clouse happened to see Hendrix's daughter Judy Rutherford, and Clouse told Rutherford that she was sorry about Hendrix's death. Clouse added that she could not believe Petitioner carried through with what he had said. Law enforcement officers later paid Clouse a visit and interviewed her about what she had told Judy Rutherford. (Tr. 189-92).

At trial, the prosecutor elicited Clouse's testimony that she had several felony convictions for drug offenses, including a distribution charge. She served six and one-half years in prison for a 30-year partially suspended sentence. She testified that no one had promised her anything for her testimony. (Tr. 192-94).

On cross-examination, the defense questioned Clouse about why she did not come forward with her information, and she testified she was in shock that Petitioner had shot Hendrix, and she thought the case was over. (Tr. 203). Defense counsel then questioned Clouse, asking her to reiterate her criminal history and to specify the types of drugs that were relevant to her offenses and what drugs she possessed for distribution. Defense counsel also asked her about her trafficking in food stamps. (Tr. 207).

Petitioner claims the trial court improperly prevented him from asking Clouse about additional pending cases in Texas. In a hearing outside the jury, Petitioner was given the opportunity to establish the relevance of the Texas cases. Clouse acknowledged she had pending cases in Texas and informed the trial court that she expected the charges to be dismissed for reasons unrelated to her appearance in this case. Defense counsel asked her whether she came forward with her information about Petitioner's comments after she was charged with the Texas cases, and Clouse denied any connection between her Texas

23

indictment and revealing the comments Petitioner made to her. According to Clouse, she had not discussed the murder case against Reed with Texas officials. (Tr. 212-30). The trial court considered the testimony and the applicable state law and determined there was no evidence to support bias:

> [T]he Court finds that the indictments on the 18th day of January of 2007 track an offense that occurred in January and April of 2005. The Court finds that for the Court to rule on that, this is an area that may be explored as biased is extremely speculative. There is no testimony whatsoever that the prosecutor at this point has had any conversation with anybody regarding any offers. Further the witness testified that she did not expect anything, and I find no nexus between the charges and any bias that counsel attempted to establish. Further the Court rules that questions--further an attempt to impeach on a collateral issue that of which the drugs and drug use that the State asked the question and the Court has heard testimony and without having a whole trial as to litigating that issue the Court rules that I am not going to allow the Defense to cross-examine further regarding the pending charges in Texas.

(Tr. 235).

On direct appeal, the OCCA ruled as follows: "We find . . . that the trial court did not abuse its discretion in finding that the prior arrest on pending cases of two witnesses were not relevant to bias." *Reed*, No. F-2008-449, slip op. at 3. The OCCA continued in a footnote:

> The extent of questioning is left to the discretion of the trial court. *Scott v. State*, 891 P.2d 1283, 1294 (Okla. Crim. App. 1995). The defendant may cross-examine witnesses on prior arrests and convictions which are relevant to the witness's bias, but this determination is initially also left to the trial court's discretion. *Livingston v. State*, 907 P.2d 1088, 1092-93 (Okla. Crim. App. 1995); *Scott*, 891 P.2d at 1294; *Beck v. State*, 824 P.2d 385, 389 (Okla. Crim. App. 1991). The trial court must determine whether the evidence allegedly creating bias is relevant, whether it is otherwise admissible, and whether it should be excluded as too prejudicial even if admissible. *Livingston*, 907 P.2d at 1093. The record does not support Reed's claim that either Rutherford's arrest and deferred charge for bad checks, or Clouse's

pending criminal cases in Texas, were relevant to show bias in this case. *Reed*, No. F-2008-449, slip op. at 3 n.5.

This Court finds the OCCA's decision was consistent with Supreme Court law. Defense counsel thoroughly cross-examined Clouse on her testimony, and the jury observed her demeanor and credibility. There was no evidence to support an inducement to testify in exchange for favorable treatment of Clouse's Texas cases, or that the prosecutor had any control over the Texas cases. Finally, Clouse's information was revealed to Rutherford at a chance meeting, not because Clouse came forward to report Petitioner's statements to law enforcement in the pursuit of favorable treatment.

### B. Judy Rutherford

Ms. Hendrix's daughter Judy Rutherford lived in Hendrix's home, but she was away at the time of the shooting (Tr. 134-35). Rutherford's testimony conflicted with Petitioner's statement to police regarding where Hendrix kept her pistol. Petitioner told police that Hendrix reached down and got her pistol from her purse beside the bed, but Rutherford testified that Hendrix usually kept her pistol wrapped in a white cloth and between her mattresses. Furthermore, on the day of the shooting, Rutherford had looked for something in Hendrix's purse, and Hendrix's pistol was not in the purse. Rutherford also testified that there were no arguments between Petitioner and Hendrix when she was present earlier that day. (Tr. 147-57; 454).

Rutherford had criminal charges and outstanding warrants, and when she was at the Idabel police department to pay some fines, she was arrested on outstanding warrants. That was when she gave her statement to police about this case. Petitioner was allowed to

25

question her about her outstanding warrants and arrests that did not result in convictions. (Tr. 161-63). The trial court limited defense counsel's questions only when he asked about the specific nature of an arrest and was unable to show how it was relevant to the case or to showing bias:

> [DEFENSE ATT]: Isn't it a fact, ma'am, that it was within a week after your mother's death you were writing checks on her bank account?
>
> [PROSECUTOR]: Your Honor, I object to the relevancy of that.
>
> THE COURT: Sustained.
>
> [DEFENSE ATT]: Your Honor, may we approach[?].
>
> [PROSECUTOR]: We're going to request the jury be admonished also, Your Honor.
>
> [DEFENSE ATT]: Your Honor, under Scott v. State we have the right to bring up prior arrests on the basis whether it goes to bias or motive in the basis of testimony.
>
> THE COURT: The question was, his question was isn't it true that you were writing checks on your mother's account one week after that?
>
> [DEFENSE ATT]: Your Honor, if I may?
>
> THE COURT: Number one, how is that relevant? and two, how do you get there?
>
> [DEFENSE ATT]: Under Scott v. State the relevance is that it goes to bias, and to the death of her mother she wrote a check, was writing hot checks on her account. She was arrested and charged.
>
> THE COURT: Was she convicted of it?
>
> [DEFENSE ATT]: They were deferred but under Scott v. State we have the right to go even on unadjudicated we can go into the arrest. That's under Oklahoma 1995 OK CR 14, specifically says we can go into arrest. It

does not have to be convictions if it goes to bias, motive or reason.

      [PROSECUTOR]:  It doesn't go to any of those items.  Counsel is complaining that she is a Johnny-come-lately witness.  All she has done when she's been here is laid the groundwork, give the jury the lay of the land.

      [DEFENSE ATT]:  Your Honor, what she's done is because she was arrested on that the story she made up with writing the checks.

      THE COURT:  I'm going to sustain the objection.

(Tr. 165-67).

Respondent alleges that defense counsel was correct in his statement that *Scott v. State*, 891 P.2d 1283, 1292 (Okla. Crim. App. 2002), allows for inquiry into prior arrests to expose bias.  *Scott*, however, also held that "[t]his does not mean [defense counsel] is entitled to cross examine witnesses about prior arrests.  *Id*., 891 P.2d at 1292.  He first must show how such an inquiry would be relevant.  *Id.*  Petitioner, however, failed to make that threshold showing at trial.  Therefore, this Court finds the trial court did not abuse its discretion.

Pursuant to *Van Arsdall*, 475 U.S. at 679, this Court further finds the trial court did not unfairly prevent Petitioner from presenting evidence critical to his defense.  Regarding Clouse, the evidence of her Texas cases would not have shown bias.  As for Rutherford, the defense was unable to establish the relevance of Rutherford's use of Hendrix's bank account.  The Court further finds the suppression of evidence Petitioner desired from these two witnesses did not affect the outcome of the trial.  Because the evidence did not show bias, it was inadmissible under Oklahoma law.  Petitioner was allowed to present evidence of the previous arrests and warrants of both witnesses.  The OCCA's determination of this ground

for habeas relief was a reasonable application of Supreme Court law, and Petitioner has failed to show the OCCA's interpretation of its own evidentiary law was contrary to, or an unreasonable application of, clearly established Supreme Court precedent. Habeas relief is not warranted on this claim.

## IV. Admission of Photographs (Ground 5)

Petitioner alleges that the display of irrelevant and prejudicial photographs at trial was reversible error and violated his due process rights. He claims the prosecutor used the photographs to inflame the passions of the jury and to deprive him of a fundamentally fair trial.

On direct appeal the OCCA found "the trial court did not abuse its discretion in admitting photographs which showed the nature and extent of Hendrix's wounds and corroborated the medical testimony. *Reed*, No. F-2008-449, slip op. at 3 (citing *Livingston*, 907 P.2d at 1094). Petitioner incorrectly characterized the photographs as "in-life photographs" showing the victim's general appearance and condition while living. In a footnote the OCCA stated that "[c]ontrary to Reed's argument, the photographs were not admitted to show the victim's general appearance while alive, [and] Okla. Stat. tit. 12, § 2403 has no relevance to show bias in this case." *Reed*, No. F-2008-449, slip op. at 3 n.6.[1]

The admission of photographs is an issue of state law, and "[f]ederal habeas review

---

[1] Okla. Stat. tit. 12, § 2403, states: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, undue delay, needless presentation of cumulative evidence, or unfair and harmful surprise. However, in a prosecution for any criminal homicide, an appropriate photograph of the victim while alive shall be admissible evidence when offered by the district attorney to show the general appearance and condition of the victim while alive."

is not available to correct state law evidentiary errors . . . ." *Wilson v. Sirmons*, 536 F.3d 1064, 1114 (10th Cir. 2008) (citations omitted). The Supreme Court has held that a habeas petitioner is only entitled to relief under the due process clause when "evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair." *Payne v. Tennessee*, 501 U.S. 808, 825 (1991).

The record shows the photographs at issue depicted the victim with emergency life support respiration and monitoring equipment, apparently taken when she was on a gurney. Police Officer Kevin Bright of Tyler, Texas, testified he met the helicopter bringing Hendrix to the East Texas Medical Center, and he took two photographs of her condition when she arrived. (Tr. 368). Exhibit 26 depicted Hendrix's condition and injury caused by the shooting, taken from above her head. Exhibit 27 depicted Hendrix's head from side to side, with a ruler held beside her head to demonstrate the size of the injury. (Tr. 368-69; Dkt 12-9 at 43-44). The trial court found the two photographs admissible, when coupled with the stipulated autopsy report, State's Exhibit 31. The autopsy report described the cause of death as a gunshot wound that caused an entry and exit wound, with details of the damage.

Photographs are admissible if they are relevant and their probative value is not substantially outweighed by the danger of unfair prejudice or needless presentation of cumulative evidence. *Lockett v. State*, 53 P.3d 418, 425 (Okla. Crim. App. 2002). *See also Hogan v. State*, 139 P.3d 907, 920-21 (Okla. Crim. App. 2006) (holding that disturbing photographs of the crime scene and victim's wounds depicted the killer's handiwork and were not unfairly prejudicial).

Here, the Court finds that "[g]iven the probative nature of the photographs, the

29

gruesome character of the crime itself, and the wealth of additional evidence supporting [Petitioner's] conviction[], the admission of the photographs was not so unduly prejudicial as to render the proceedings against [P]etitioner fundamentally unfair." *Smallwood v. Gibson*, 191 F.3d 1257, 1275 (10th Cir. 1999), *cert. denied*, 531 U.S. 833 (2000) (citation omitted). Consequently, petitioner is not entitled to relief on this ground.

## V.  Motion for New Trial (Ground 6)

Petitioner alleges that following his trial, defense counsel obtained evidence that prompted the filing of a motion for a new trial. This evidence was presented to the Court at his sentencing on May 12, 2008. The trial court reviewed the evidence and overruled the motion. Petitioner maintains the new evidence would have changed the verdict if it had been presented to a jury, and it had a direct bearing on the motive of a State's witness.

Petitioner's motion for a new trial was based on the affidavit of Terry Watson, who claimed to be a cousin of State's witness Wyva Clouse. The affidavit stated the following:

> About one (1) to two (2) months after the arrest of Chad Reed for the shooting death of Mrs. Hendrix I was visiting my cousin Wyva Clouse. Wyva Clouse told me that one of Chad Reed's aunt's [sic] had offered her money to make up a story that would get Chad convicted of murder for the Shooting of Mrs. Hendrix.

(O.R. 344-46).

At the motion hearing, Petitioner did not explain why this newly discovered evidence could not have been discovered before trial with reasonable diligence. Petitioner argued that the affidavit called into question Clouse's motive or bias for coming up with her story months after the shooting. The State argued Petitioner did not show the additional impeachment of Clouse would have made a difference, because Clouse's testimony was not

the main evidence against Petitioner, and there were numerous attempts to impeach Clouse at trial. Therefore, the State alleged there was no reasonable probability Watson's testimony would have changed the outcome of the trial. The trial court overruled the motion. (Sentencing Tr., Dkt. 11-10 at 104-09).

The OCCA denied relief on this claim, finding "the trial court did not abuse its discretion in denying Reed's motion for a new trial based on newly discovered evidence. *Reed*, No. F-2008-449. slip op. at 3. In a footnote, the OCCA expanded its reasoning as follows:

> In determining whether to grant a new trial based on newly discovered evidence, the trial court and this Court must consider: (1) whether the evidence is material; (2) whether it could not have been discovered before trial with reasonable due diligence; (3) whether it is cumulative; and (4) whether it creates a reasonable probability that, had it been introduced at trial, it would have changed the outcome. *Ellis v. State*, 867 P.2d 1289, 1303 (Okla. Crim. App. 1992). Reed completely fails to show that the evidence could not have been discovered before trial. Arguably this evidence would have been relevant to show Clouse was biased against Reed. As it reflects a financial motive and thus differs in kind from the other evidence Reed used to impeach Clouse, it would not have been cumulative. However, the record does not support Reed's claim that this evidence creates a reasonable probability that the outcome of the trial would have changed. It is inconsistent with the facts surrounding Clouse's testimony. Clouse never approached law enforcement and was not contacted by them until several months after Reed's arrest. If she had the financial motive to testify against Reed suggested by the affidavit, she arguably would have come forward much sooner. In addition, jurors could have wholly disregarded Clouse's testimony, reviewed the other evidence, and found beyond a reasonable doubt that Reed shot the victim intending to kill her.

*Reed*., No. 2008-449, slip op. at 3-4 n.7.

Petitioner alleges in his petition that the OCCA's decision was in direct contradiction to *United States v. Bagley*, 473 U.S. 667 (1985). *Bagley*, however, concerned the State's

suppression or failure to disclose potential impeachment evidence properly requested by the defendant. *Id.*, 473 U.S. at 676. This claim was not raised in Petitioner's direct appeal, but *Bagley* was mentioned in his appeal brief as an analogous "*cf.*" support for the proposition that impeachment evidence is a type of exculpatory evidence. (Dkt. 11-1 at 50). Petitioner does not allege the State suppressed evidence, and he has not identified any applicable Supreme Court law that is relevant to this issue. He, therefore, cannot establish a due process claim based on the trial court's denial of his motion for retrial. *See Giglio v. United States*, 405 U.S. 150, 154 (1972) ("We do not . . . automatically require a new trial whenever a 'combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict . . . .'") (citation omitted).

The Court finds Petitioner has not shown that the OCCA's factual finding is clearly and convincingly incorrect. Therefore, this Court must defer to the OCCA's determination. *See* 28 U.S.C. § 2254(e)(1). The Court further finds the OCCA's decision was not inconsistent with Supreme Court law. *See* 28 U.S.C. §§ 2254(d). This ground for habeas relief fails.

## VI. Cumulative Error (Ground 7)

Petitioner alleges the cumulative effect of all the errors in his case deprived him of a fair trial. The OCCA found because there was no error in Petitioner's claims in his direct appeal, there was no cumulative error (citing *Alverson v. State*, 983 P.2d 498, 520 (Okla. Crim. App. 1999). *Reed*, No. F-2008-449, slip op. at 4 & n.8.

"Cumulative-error analysis applies where there are two or more actual errors. It does not apply, however, to the cumulative effect of non-errors." *Hoxsie v. Kerby*, 108 F.3d 1239,

1245 (10th Cir.) (citing *United States v. Rivera*, 900 F.2d 1462, 1471 (10th Cir. 1990) *cert. denied*, 522 U.S. 844 (1997)). *See also Castro v. Ward*, 138 F.3d 810, 832-33 (10th Cir.), *cert. denied*, 525 U.S. 971 (1998); *Le v. Mullin*, 311 F.3d 1002, 1023 (10th Cir. 2002), *cert. denied*, 540 U.S. 833 (2003) ("When reviewing a case for cumulative error, only actual errors are considered in determining whether the defendant's right to a fair trial was violated."). "Notably, in the federal habeas context, cumulative error analysis applies only to cumulative constitutional errors." *Young v. Sirmons*, 551 F.3d 942, 972 (10th Cir. 2008) (citing *Jackson v. Jackson*, 194 F.3d 642, 655 n.59 (5th Cir. 1999), *cert. denied*, 558 U.S. 906 2009).

Here, the Court finds the OCCA's denial of this claim based on cumulative error was not an unreasonable application of Supreme Court law. *See* 28 U.S.C. § 2254(d). Therefore, relief cannot be granted on this ground for habeas relief.

## VII.  Procedural Bar (Grounds 8, 9, 10, 11, 12, and 13)

Respondent alleges that Grounds 8, 9, 10, 12, and 13 are procedurally barred, because these claims were not raised on direct appeal to the OCCA.  Instead, Petitioner attempted to raise the claims in his application for post-conviction relief.  (Dkts. 11-4, 11-5, 11-6).  As for Ground 11, ineffective assistance of appellate counsel, Respondent alleges Petitioner cannot show that appellate counsel was ineffective in failing to raise the issues in Grounds 9 or 10 on direct appeal.  The grounds for relief are summarized as follows:

Ground 8:  Petitioner was subjected to prosecutorial misconduct by the use of perjured testimony to make Petitioner appear to be the aggressor, to get preferential instruction, and to cheat Petitioner out of his defense of self-defense.

Ground 9:  The State committed a *Brady* violation by failing to turn over an interview statement of Hollingsworth and by failing to tell the defense about preferential treatment of Clouse and Hollingsworth.

Ground 10: Trial counsel was ineffective in failing to challenge the State's case, failing to obtain impeachment evidence, refusing to permit Petitioner to testify, calling OSBI agent Cliff Fielding as a witness, failing to move to suppress the testimony of Clouse and Rutherford, permitting Rutherford to testify when she had violated the Rule of Sequestration, and failing to impeach Hollingsworth with her inconsistent statement.

Ground 11: Appellate counsel was ineffective in failing to raise impeachment evidence and *Brady* violation on direct appeal.

Ground 12: Improper jury instruction was given, because Hollingsworth's change in her testimony took the burden off the State to disprove self-defense and to prove Petitioner was the aggressor.

Ground 13: The incomplete trial record does not have argument presented at trial about the safety being off on Hendrix's gun.

The record shows that in its Order Affirming Denial of Post-Conviction Relief, the OCCA barred Grounds 8, 9, 10, 12, and 13, because Petitioner did not raise them in his direct appeal. The ineffective assistance of appellate counsel presented in Ground 11 was denied on the merits:

Petitioner asserts twenty grounds for relief raised in this post-conviction proceeding. With the exception of his claim of ineffective assistance of appellate counsel, all of his claims for relief either were or could have been raised in his direct appeal. Issues that were previously raised and ruled upon by this Court are procedurally barred from further review under the doctrine of *res judicata*; and issues that were not raised previously on direct appeal, but which could have been raised, are waived for further review. Okla. Stat. tit. 22, § 1086; *Logan v. State*, 293 P.3d 969, 973 (Okla. Crim. App. 2013).

In order to establish a claim of ineffective assistance of appellate counsel, Petitioner must show both (1) deficient performance, by demonstrating that his appellate counsel's conduct was objectively unreasonable, and (2) resulting prejudice, by demonstrating a reasonable probability that, but for appellate counsel's unprofessional error, the result of his appeal would have been different. *Logan*, 294 P.3d at 973. Petitioner's jury found him guilty beyond a reasonable doubt. He has not offered any new evidence of arguments in this

matter that would support a finding that his current grounds for relief have merit. *Logan, supra.* He has not met his burden of establishing a reasonable probability that the outcome of his appeal would have or should have been different. *Logan, supra.* Therefore, the order of the District Court of McCurtain County denying Petitioner's application for post-conviction relief in Case No. CF-2008-581 should be, and is hereby, **AFFIRMED**.

*Reed v. State*, No. PC-2013-698, slip op. at 1-2 (Okla. Crim. App. Oct. 16, 2013) (Dkt. 11-8).

The OCCA denied relief for Grounds 8, 9, 10, 12, and 13, because Petitioner failed to comply with procedural rules. The Tenth Circuit has acknowledged Oklahoma's consistent application of the "waiver" rule in appellate proceedings and that the OCCA's procedural bar rests on an adequate and an independent state ground. *Steele v. Young*, 11 F.3d 1518, 1522 (10th Cir. 1993). *See also Ellis v. Hargett*, 302 F.3d 1182, 1186 (10th Cir. 2001) (holding that Okla. Stat. tit. 22, § 1086 "is an independent and adequate state ground for denying habeas relief").

With respect to Petitioner's ineffective assistance of trial counsel claim in Ground 10, the Tenth Circuit has provided an exception to the general rule of procedural default. *Breechen v. Reynolds*, 41 F.3d 1343, 1363 (10th Cir. 1994) (citing *Kimmelman v. Morrison*, 477 U.S. 365 (1986)). In *English v. Cody*, 146 F.3d 1257 (10th Cir. 1998), the Tenth Circuit narrowed the circumstances requiring imposition of a procedural bar on ineffective assistance of counsel claims first raised collaterally:

> *Kimmelman*, *Osborn*, and *Brecheen* indicate that the Oklahoma bar will apply in those limited cases meeting the following two conditions: trial and appellate counsel differ; and the ineffectiveness claim can be resolved upon the trial record alone. All other ineffectiveness claims are procedurally barred only if Oklahoma's special appellate remand rule for ineffectiveness claims is adequately and evenhandedly applied.

*Id.*, 146 F.3d at 1264 (citation omitted).

The record shows Petitioner was represented at trial by attorneys Kurt Hoffman and Joe Robertson, and Cary Pirrong represented him on appeal. Petitioner, therefore, had the opportunity to confer with separate counsel on appeal, meeting the first requirement of *English*. The second *English* factor requires that the claim could have been resolved either "upon the trial record alone" or after adequately developing a factual record through another procedural mechanism. *Id.* at 1263-64.

Petitioner alleges in Ground 10 of the petition that trial counsel provided ineffective assistance when he (1) failed to challenge the State's case, (2) failed to use impeachment evidence on the only witness to the shooting, (3) refused to allow Petitioner to testify in his own defense, (4) called OSBI agent Cliff Fielding as a witness, when counsel know it would destroy Petitioner's credibility, (5) failed to move to suppress the testimony of Clouse and Rutherford, (6) permitted Rutherford to testify when she had violated the Rule of Sequestration, and (6) failed to impeach Hollingsworth with her inconsistent statement. (Dkt. 1 at 22).

Respondent alleges that even if all of Petitioner's defaulted claims could not be resolved on the record alone, he has failed to show or allege how the Oklahoma remand procedure provided by Rule 3.11, *Rules of the Oklahoma Court of Criminal Appeals*, Okla. Stat. tit. 22, Ch. 18, App. (2003), was inadequate to allow him to supplement the record on his ineffective assistance of counsel claims. *See Hooks v. Ward*, 184 F.3d 1206, 1217 (10th Cir. 1999) (holding that once the State pleads the affirmative defense of an independent and adequate state procedural bar, the burden shifts to the petitioner to make specific allegations as to the inadequacy of the state procedure).

Rule 3.11 provides an adequate opportunity for defendants to supplement the record to raise claims of ineffective assistance of trial counsel on appeal, and Petitioner had this means to supplement his direct appeal record. *See Lott v. Trammell*, 705 F.3d 1167, 1213 (10th Cir. 2013) (holding Rule 3.11's standard for granting an evidentiary hearing is not contrary to or an unreasonable application of *Strickland*). "[A]ny denial of a request for an evidentiary hearing on the issue of ineffective assistance of counsel filed pursuant to OCCA Rule 3.11. . . operates as an adjudication on the merits of the *Strickland* claim and is therefore entitled to deference under § 2254(d)(1)." *Id.*

Because Petitioner has procedurally defaulted the identified claims in state court, this Court may not consider the claims unless Petitioner shows cause and prejudice for the default, or demonstrated a fundamental miscarriage of justice would result if his claims are not considered. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

"'[C]ause' under the cause and prejudice test must be something *external* to the petitioner, something that cannot fairly be attributed to him." *Id.* 501 U.S. at 753 (emphasis in original). With respect to the "prejudice" prong of the "cause and prejudice" requirement, a petitioner "must shoulder the burden of showing, not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original). To show a fundamental miscarriage of justice, Petitioner "must make a colorable showing of factual innocence." *Beavers v. Saffle*, 216 F.3d 918, 923 (10th Cir. 2000) (citing *Herrera v. Collins*, 506 U.S. 390, 404 (1993)).

## A.  Ineffective Assistance of Appellate Counsel as Cause and Substantive Claim

Petitioner attributes his failure to raise the defaulted claims on direct appeal to the ineffective assistance of his appellate counsel.  Respondent alleges this argument fails to establish cause for Grounds 8 (failure to raise prosecutorial misconduct), 12 (failure to raise improper jury instructions), and 13 (failure to raise incomplete trial record).

Petitioner raised ineffective assistance of appellate counsel as an independent claim in his post-conviction proceedings.  He did not, however, allege ineffective appellate counsel in his post-conviction proceedings on the basis of failure to raise prosecutorial misconduct, jury instructions, or incomplete trial record, which would be necessary to establish "cause" for his procedural default of those claims.  Consequently, ineffective assistance of appellate counsel may not serve as cause for Petitioner's procedural default of Grounds 8, 12, or 13 of this habeas petition.

> [I]neffective assistance adequate to establish cause for the procedural default of some other constitutional claim is itself an independent constitutional claim. And we held in [*Murray v.*] *Carrier*, [477 U.S. 478 (1986)], that the principles of comity and federalism that underlie our longstanding exhaustion doctrine-- then as now codified in the federal habeas statute, see 28 U.S.C. §§ 2254(b), (c)--require *that* constitutional claim, like others, to be first raised in state court.  "[A] claim of ineffective assistance," we said, generally must "be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default."  *Carrier*, *supra*, at 489.

*Edwards v. Carpenter*, 529 U.S. 446, 451-52 (2000).

The OCCA barred Grounds 8, 9, 10, 12, and 13, because Petitioner did not raise the issues in his direct appeal, and, as discussed above, the OCCA also denied Ground 11, the ineffective assistance of appellate counsel claim, on the merits.  *Reed*, PC-2013-698, slip op. at 1-2.  Because the ineffective assistance of appellate counsel claim was denied on the

merits, this Court's review is limited to determining whether Petitioner can show that the state court's disposition is "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *Cargle v. Mullin*, 317 F.3d 1196, 1202 (10th Cir. 2003); *Ellis v. Hargett*, 302 F.3d 1182, 1187 (10th Cir. 2002).

### B.  Ineffective Assistance of Counsel Standard of Review

Habeas relief may be granted only if the OCCA's decision unreasonably applied the standard for ineffective assistance of counsel claims set by *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984).  The question is not whether the OCCA's determination of this claim was incorrect, "but whether that determination was unreasonable--a substantially higher threshold."  *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citation omitted).

"There is a strong presumption that counsel provided effective assistance of counsel and petitioner has the burden of proof to overcome that presumption."  *United States v. Rantz*, 862 F.2d 808, 810 (10th Cir. 1988) (citing *United States v. Cronic*, 466 U.S. 648, 658 (1984)), *cert. denied*, 489 U.S. 1089 (1989).  To establish cause sufficient to overcome the procedural bar, and to establish a separate claim of ineffective assistance of appellate counsel, Petitioner must satisfy both prongs of the *Strickland* test.  *Strickland's* two-part test for determining the validity of a habeas petitioner's claim of ineffective assistance of counsel requires the following:

> . . . First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose

result is reliable. . . .

*Strickland*, 466 U.S. at 687. "Moreover, the reasonableness of the challenged conduct must be evaluated from counsel's perspective at the time of the alleged error; every effort should be made to eliminate the distorting effects of hindsight." *United States v. Blackwell*, 127 F.3d 947, 955 (10th Cir. 1997) (quoting *Edens v. Hannigan*, 87 F. 3d 1109, 1114 (10th Cir. 1996); *Strickland*, 466 U.S. at 689) (internal quotations omitted).

Respondent maintains the underlying claims are barred but recognizes that Petitioner's claim of ineffective assistance of appellate counsel requires a review of the barred claims in Grounds 9 and 10. Therefore, the merits of these claims must be reviewed.

### C. *Brady* Violations (Ground 9)

Petitioner claims the State failed to turn over the written statement documenting McCurtain County Sheriff's Deputy Kevin Willis's interview of Hollingsworth on the night of the shooting, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). *Brady* held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.*, 373 U.S. at 87.

Petitioner places significance on the fact that one version of the McCurtain County Incident Report contains only Deputy Lori Chipp's report of her interview with Hollingsworth, while another version contains both Chipp's report and Willis's report. The McCurtain County Incident Report containing only a narrative report by Deputy Chipps is attached to Petitioner's Amended Application for Post-Conviction Relief, filed on August 1, 2012. (Dkt. 11-6 at 23-27). The version with both reports is attached to his original post-

conviction application, filed on September 23, 2010. (Dkt 11-4 at 19-23).

The State's December 20, 2007, Discovery Response indicates the OSBI Prosecutorial Report was provided to counsel in response to Petitioner's discovery request and the requirements of the Oklahoma Discovery Code, Okla. Stat. tit. 22 § 2002(A) (2011) (O.R. 183-87) (Dkt. 11-9 at 1-5). Petitioner acknowledges that the Willis interview was part of the OSBI Prosecutorial Report. (Dkt. 11-6 at 10). Therefore, there is no evidence of a *Brady* violation, and appellate counsel was not ineffective for failing to raise a *Brady* claim on direct appeal. See *United States v. Orange*, 447 F.3d 792, 797 (10th Cir. 2006) ("If the omitted issue is without merit, then counsel's failure to raise it is not prejudicial, and thus not ineffective assistance."). The OCCA's denial of Petitioner's ineffective assistance of appellate counsel claim for failing to raise a *Brady* claim on direct appeal was not contrary to, or an unreasonable application of clearly established Supreme Court law.

Petitioner also complains that the State committed a *Brady* violation by failing to inform defense counsel about preferential treatment of State's Witnesses Wyva Clouse and Patricia Hollingsworth. He alleged in Proposition 16 of his amended post-conviction application that he heard from someone named Kelly Mundale, now deceased, that the district attorney gave Clouse preferential treatment for drug violations, and Petitioner claimed in Proposition 17 that the State did not turn over Hollingsworth's statement to Willis. (Dkt. 11-6 at 8-10).

As discussed above, Petitioner is incorrect about whether Hollingsworth's statement was turned over by the State. Furthermore, as discussed above in the section concerning Ground 4 of this petition, Clouse was cross-examined about her criminal history and testified

that no one promised her anything. (Tr. 194). Petitioner's speculation does not establish a *Brady* claim.

Even assuming *arguendo* there was a favorable resolution of a State's witness's criminal charges, "[t]he mere fact that the witnesses were subsequently allowed to plead on favorable terms is not evidence that the plea agreements were secretly reached prior to the witnesses' testimony and improperly withheld from the defense." *United States v. Molina*, 75 F.3d 600, 602 (10th Cir.) (citing *United States v. Ramirez*, 608 F.2d 1261, 1267 (9th Cir. 1979)), *cert. denied*, 517 U.S. 1249 (1996). Because the facts do not support Petitioner's *Brady* claims, appellate counsel was not ineffective in failing to raise meritless propositions before the OCCA. *Cargle*, 317 F.3d at 1202 (holding that "if the issue is meritless, its omission will not constitute deficient performance").

### D. Ineffective Assistance of Trial Counsel (Ground 10)

Petitioner alleges his trial counsel was deficient for numerous reasons: failing to challenge the State's case, failing to obtain impeachment evidence, failing to use impeachment evidence with Hollingsworth, refusing to permit Petitioner to testify, presenting the testimony of an OSBI witness, failing to file a motion to suppress the testimony of Clouse and Rutherford, and permitting Rutherford to testify knowing she violated the Rule of Sequestration.

#### 1. Failure to Challenge the State's Case and Failure to Obtain and Use Impeachment Evidence

The record shows that defense counsel presented an active defense and engaged in lengthy cross-examination of the State's witnesses to establish many of Petitioner's points and to undermine the State's evidence. His lengthy opening statement planted the seed that

the State's witnesses were biased. Counsel impeached Rutherford, Clouse, and Hollingworth on their recollections of the events, discrepancies in their testimony, and their prior arrests and criminal charges.

Petitioner claims trial counsel should have impeached Hollingworth on discrepancies between her trial testimony and her prior police statement to Willis. Willis's report stated he spoke with Hollingsworth, asked her what happened, and she gave him the following oral statement:

> When we arrived, I spoke with Hollingsworth and asked her to tell me what happened. She stated Chad had picked her up from work and went to the Choctaw Casino in Broken Bow. She stated they were at the Casino for about 15 minutes and then went to the Travel Plaza to get drinks. They then went to Chad's house to pick up some clothes. When they arrived, Hollingsworth stated she went inside and spoke to Hendrix. Hollingsworth stated she told Hendrix that she and Chad were going to spend the night in a motel and that she was there to pick up a few thing and then leave. Hollingsworth then stated Hendrix went inside her (Hendrix) bedroom. Hollingsworth stated she went in Chad's bedroom and got some clothing and then walked to the kitchen to get a drink. She stated she could hear Chad and Hendrix talking, but did not know what they were talking about. Hollingsworth then stated she heard Hendrix say "I'll shoot you in the fucking head." She then heard a shot. She stated she saw Chad standing in the hall by Hendrix's door. She stated Chad told her to call 911 and that he had just shot his grandmother. Hollingsworth then called 911.

(Dkt. 11-4 at 23).

At trial, Hollingsworth testified she was in the kitchen with Hendrix. (Tr. 261). Petitioner was in his bedroom, and Hollingsworth also went in his bedroom and gathered some clothes for the night. (Tr. 261). Hendrix was in her room and yelled something about the dog being on the bed. (Tr. 263). When Hendrix said that, Petitioner still was in his bedroom. (Tr. 264). Petitioner asked Hendrix what was the difference between

43

Hollingsworth's dog and Hendrix's dogs being on the bed. (Tr. 264). While Hollingsworth heard the exchange between Petitioner and Hendrix, Hollingsworth was going to the kitchen to get a drink. (Tr. 265). The voices were argumentative, and when Petitioner asked Hendrix about the difference between the dogs, Hendrix said, "I'll blow your fucking head off." (Tr. 266). Hollingsworth then heard a gunshot while she was at the end of the hallway in the living room, about to turn into the kitchen. (Tr. 266). When she heard the gunshot, she turned around to look and saw Petitioner standing in the hall at Hendrix's bedroom door, holding a gun extended. (Tr. 267-68).

Comparing Hollingsworth's statement and her trial testimony, the Court finds there was no material difference between the two accounts. Under each, Hollingsworth heard Hendrix verbally threaten Petitioner, heard a gunshot, and learned Petitioner had shot Hendrix. Any inconsistencies between the statement and the testimony are minor. Defense counsel cross-examined Hollingsworth at length on the events, as well as on her previous convictions and history of drug abuse. The Court finds there is no viable claim of ineffective assistance of trial counsel for failing to actively pursue Petitioner's defense. Therefore, appellate counsel was not ineffective in failing to raise this claim on appeal.

Petitioner also claims trial counsel should have moved to suppress the testimony of Clouse and Rutherford, but he has failed to identify any reason why the testimony of these two witnesses would be inadmissible. The State is authorized to present its case, and the testimony of these two witnesses was relevant and admissible under the Oklahoma Evidence Code. Trial counsel was not ineffective in his failure to make futile objections or motions to suppress admissible evidence. *See Jennings v. Parker*, No. 10-CV-390-JHP-FHM, 213

WL 322123, at *8 (N.D. Okla. Jan. 28, 2013) (unpublished) (holding that failure to object where there is no basis for objection is not deficient performance). Consequently, appellate counsel was not ineffective in failing to raise this issue on appeal.

### 2. Testimony of OSBI Agent Fielding

Petitioner alleges trial counsel was ineffective for calling OSBI Agent Cliff Fielding to testify about his interview of Petitioner the night of the shooting. Fielding testified Petitioner waived his *Miranda* rights and spoke to him without hesitation. Fielding presented Petitioner's statement, including his claim that Hendrix pointed her gun at him and attempted to shoot him. Fielding testified:

> According to what he told us he said she produced a gun, pulled a gun out of the purse next to the bed, pointed the gun at him and according to Chad he could see the trigger being pulled, but the gun didn't go off. He felt like he was in fear for his life. According to him Dorothy turned the gun back towards himself and turned the safety off engaging the weapon I guess you could say and pointed it at him. He pulled the gun out of the back of his pants or pocket and shot one time shooting Dorothy in the head.

(Tr. 454; Dkt. 11-10 at 90).

The Court finds that using Fielding as a witness was a reasonable strategic decision to present a credible witness to relate Petitioner's self-defense theory. Fielding's testimony also revealed that law enforcement delayed in interviewing Clouse about Petitioner's statement to her two days before the shooting. (Tr. 456-57). In addition, Fielding's testimony that the position of the gun under Hendrix's body indicated she was sitting up when Petitioner shot her supported Petitioner's version that Hendrix was attempting to shoot him. (Tr. 465-66).

The Court finds Petitioner has failed to show that trial counsel's decision to call

Fielding was objectively unreasonable. Counsel's strategic decisions must be judged from counsel's perspective at the time they are made and are presumptively reasonable. *Strickland*, 466 U.S. at 689-90. Petitioner has pointed to nothing in Fielding's testimony that prejudiced Petitioner's defense, and counsel's strategy of using Fielding's testimony to tell Petitioner's story placed Petitioner's self-defense theory before the jury. Therefore, presenting Fielding was not ineffective assistance of trial counsel, and appellate counsel was not ineffective for failing to raise this claim. *See Hatch v. Oklahoma*, 58 F.3d 1447, 1459 (10th Cir. 1995) (holding that for counsel's advice to be constitutionally ineffective, it must be completely unreasonable, bearing no relationship to possible defense strategy, not merely wrong), *overruled in part on other grounds*, *Daniels v. United States*, 254 F.3d 1180, 1188 n.1 (10th Cir. 2001) (en banc).

### 3. Judy Rutherford and the Rule of Sequestration

Petitioner alleges trial counsel wrongly permitted Rutherford to testify, after she sat in the courtroom and heard previous testimony in violation of the Rule of Sequestration. Rutherford was the State's first witness, appearing immediately after court began on February 20, 2008 (Tr. 133-34). Because no other witnesses had testified, Petitioner is incorrect in his claim. There was no violation of the Rule and no basis for an objection by trial counsel. Therefore, appellate counsel was not ineffective in not raising a meritless claim of ineffective trial counsel in Petitioner's direct appeal. *See Orange*, 447 F.3d at 797.

### 4. Refusal to Allow Petitioner to Testify

Petitioner claims his trial counsel refused to let him testify in his own defense.

A criminal defendant has a constitutional right to testify in his own behalf at trial. *Rock v. Arkansas*, 483 U.S. 44, 49-52 (1987). The decision whether to

testify lies squarely with the defendant; it is not counsel's decision. *Jones v. Barnes*, 463 U.S. 745, 751 (1983). Defense counsel should inform the defendant that he has the right to testify and that the decision whether to testify belongs solely to him. *See United States v. League*, 953 F.2d 1525, 1533-34. Counsel should also discuss with the defendant the strategic implications of choosing whether to testify, and should make a recommendation to the defendant. *See id.* Yet counsel lacks authority to prevent a defendant from testifying in his own defense, even when doing so is suicidal trial strategy. *See United States v. Jane*, 720 F.2d 1156, 1161 & n.10 (10th Cir. 1983).

*Cannon v. Mullin*, 383 F.3d 1152, 1171 (10th Cir. 2004).

At the close of the State's case, defense counsel made a record documenting

Petitioner's decision not to take the stand in his own defense as follows:

[DEFENSE ATT]:   Your Honor, for the record we have discussed with Mr. Reed the defendant in this case that he does have a constitutional right to testify in this case. After conference with Mr. Reed, repeated conferences, it is his opinion that he does not want to testify in this case and we want to make sure that there is a record consistent with that. And Mr. Reed is present to confirm that for the Court if it is so desired.

[THE COURT]:   Mr. Reed, you have heard what you're the [sic] announcement of your attorney?

[DEFENDANT]:   Yes, sir.

[THE COURT]:   And you concur in that announcement?

[DEFENDANT]:   Yes, sir.

[THE COURT]:   And you have had sufficient time to discuss this?

[DEFENDANT]:   Yes, sir.

[THE COURT]:   And I assume that there has [sic] been discussions back and forth all during this trial regarding that?

[DEFENDANT]:   Yes, sir.

[THE COURT]:     And that still remains your decision?

[DEFENDANT]:     Yes, sir.

(Tr. 469-70; Dkt. 11-10 at 469-470).  It is clear from this record that Petitioner's claim that

trial counsel did not permit him to testify is completely lacking in credibility.

Petitioner asserted in his application for post-conviction relief that trial counsel told

him the State would "jump all over" him if he testified because of Petitioner's lie to the OSBI

agent about taking the gun into the house.  Petitioner claims he told counsel he did not lie

about the gun, and Hollingworth was lying.  Counsel still told him "no" about his taking the

witness stand, knowing the prosecution would be able to elicit testimony on cross-

examination that would destroy Petitioner's credibility.  (Dkt. 11-4 at 6).

The Court finds that even if Petitioner's allegations are true, trial counsel was not

ineffective.  Trial counsel has a duty to attempt to dissuade his client from testifying, if

counsel thinks testifying is not in the client's best interest.  *See Cannon*, 383 F.3d at 1171

(holding that counsel should discuss with the defendant the strategic implications of choosing

whether to testify and should make a recommendation to the defendant).

> In drawing the "difficult line . . . between earnest counseling and [the] overt
> coercion" which amount to ineffective assistance, courts consider:
>
> (1) whether the defendant knew about his constitutional right to testify and if
> not, whether he was informed by counsel; (2) the competence and soundness
> of defense counsel's tactical advice, *i.e.*, whether counsel presents the
> defendant with sufficient information to permit a meaningful voluntary waiver
> of the right to testify; and (3) any intimidation or threatened retaliation by
> counsel relating to the defendant's testimonial decision.

*Wimberly v. McKune*, No. 97-3133, 1998 WL 115953, at *3-*4 (10th Cir. Mar. 16, 1998)

(citing *Lema v. United States*, 987 F.2d 48, 52-53 (1st Cir. 1993)).

48

The Tenth Circuit has refused to overturn a district court's finding on the question without sufficiently detailed affidavits describing the manner in which counsel coerced the defendant not to testify. *See United States v. Meachum*, 567 F.3d 1184, 1188 (10th Cir. 2009). A petitioner may not indicate at trial his apparent acquiescence in his counsel's advice that he not testify, and then later claim his will to testify was "overcome." *Hollenbeck v. Estelle*, 672 F.2d 451, 453 (5th Cir. 1982) ("Post-conviction displeasure with his attorney's advice does not change the basic constitutional determination."). Here, the record shows that Petitioner was specifically informed by the trial judge of his right to testify, and Petitioner stated he did not want to exercise that right.

Assuming defense counsel advised Petitioner not to testify, or even that counsel somehow prevented Petitioner from testifying, the Court finds Petitioner cannot show prejudice under *Strickland*. Prejudice requires a petitioner to show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694. Petitioner must show that his testimony "would have raised in a juror's mind a reasonable doubt concerning his guilt." *Cannon*, 383 F.3d at 1171 (citing *Strickland*, 466 U.S. at 694-95).

Petitioner has failed to show that trial counsel actually prevented him from testifying at trial, and he has not demonstrated a substantial likelihood of a different result if he had testified. Because Petitioner has not shown his trial counsel was ineffective on this claim, appellate counsel was not ineffective substantially or as cause to overcome the procedural bar.

### E.  Fundamental Miscarriage of Justice

As discussed above, federal courts will not review habeas corpus claims that have been defaulted in the state courts on an independent and adequate state procedural ground unless the petitioner demonstrates both cause for the default and actual prejudice, or alternatively demonstrates a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750. To satisfy the fundamental miscarriage of justice test, Petitioner must make a colorable showing of actual innocence.  "Cases involving a fundamental miscarriage of justice 'are extraordinary instances when a constitutional violation probably has caused the conviction of one innocent of the crime.'"  *Gilbert v. Scott*, 941 F.2d 1065, 1068 n.2 (10th Cir. 1991) (citing *McClesky v. Zant*, 499 U.S. 467, 494 (1991)).

Petitioner does not allege his actual innocence, and he has provided no evidence of actual innocence.  Furthermore, none of his habeas claims present new evidence that would counter the evidence at trial that proved the elements of his crime.  Therefore, Petitioner has failed to show cause for the procedural default of his claims, and the fundamental miscarriage of justice exception does not apply.  Petitioner's defaulted claims in Grounds 8, 9, 10, 12, and 13 must fail.

### F.  Ineffective Assistance of Appellate Counsel (Ground 11)

Finally, Petitioner claims he was deprived of the effective assistance of appellate counsel, because appellate counsel failed to raise two of his post-conviction claims on direct appeal: (1) the witness impeachment claim and (2) the *Brady* violation claim.  Because these two claims are not meritorious, the Court finds Petitioner has not shown that his appellate counsel was ineffective in failing to present the claims on direct appeal.  Furthermore,

Petitioner has not shown that he was prejudiced by appellate counsel's performance. *See Strickland*, 466 U.S. at 687; *Orange*, 447 F.3d at 797.

This Court's review is limited to determining whether the state court's disposition is "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The Court finds the OCCA's determination of this claim was consistent with federal law. Grounds 8, 9, 10, 11, 12, and 13 must be denied.

## Evidentiary Hearing

Petitioner has filed a Motion for Evidentiary Hearing for Sixth Amendment Claims of Ineffective Assistance of Appellate Counsel. (Dkt. 31). He asks for an evidentiary hearing on claims in Grounds 8 and 13 of the petition. Because these claims are procedurally barred, Petitioner's motion is DENIED as moot.

## Certificate of Appealability

The Court finds Petitioner has failed to make a "substantial showing of the denial of a constitutional right," as required by 28 U.S.C. § 2253(c)(2). He also has not shown "at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether [this] court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Therefore, a certificate of appealability cannot be issued.

**ACCORDINGLY,** Petitioner's petition for a writ of habeas corpus (Dkt. 1) is DENIED, and Petitioner's motion for an evidentiary hearing (Dkt. 31) is DENIED AS MOOT. Petitioner also is DENIED a certificate of appealability.

**IT IS SO ORDERED** this 3rd day of March 2017.

Ronald A. White
United States District Judge
Eastern District of Oklahoma